**SCHUYLKILL TOWNSHIP, Appellant**

v.

**PENNSYLVANIA BUILDERS ASSOCIATION, Home Builders Association of Chester and Delaware Counties, The Basile Corporation and SHC, Inc.**

Commonwealth Court of Pennsylvania.

Argued June 11, 2007.

Decided Sept. 6, 2007.

Robert J. Sugarman, Philadelphia, for appellant.

Loudon L. Campbell, Harrisburg, for appellee.

BEFORE: LEADBETTER, President Judge, LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

Schuylkill Township (Township) appeals an order of the Court of Common Pleas of Chester County that affirmed an adjudication of the Secretary of Labor and Industry (Secretary) to invalidate a Township ordinance because it conflicted with the Department of Labor and Industry's regulation establishing uniform construction standards in Pennsylvania. The Township enacted Ordinance 2005–01 to require the

installation of automatic sprinkler systems in most new construction in the Township. In this case of first impression we consider what constitutes "local" circumstances or conditions that will allow a municipality to impose stricter standards on construction than those required by the General Assembly for statewide use.

In 1999, the General Assembly enacted the Pennsylvania Construction Code Act (Act)[1] to insure uniform, modern construction standards and regulations throughout the Commonwealth for the protection of life, health and property and for the safety and welfare of consumers, the general public and the owners and occupants of buildings and structures. Section 102 of the Act, 35 P.S. § 7210.102.[2] The Act applies generally to the construction, alteration, repair and occupancy of all buildings in the Commonwealth and preempts the establishment of different construction standards by local ordinance. Section 104(a), (d) of the Act, 35 P.S. § 7210.104(a), (d). Section 301(a)(1) of the Act, 35 P.S. § 7210.301(a)(1), directed the Department of Labor and Industry (Department) to adopt, by regulation, "the 1999 BOCA National Building Code, Fourteenth Edition, as a Uniform Construction Code."[3] It did so. With limited exceptions, the Uniform Construction Code preempts and rescinds construction standards established in any Pennsylvania statute, local ordinance or regulation. 34 Pa.Code § 403.2(a). Although municipalities may enact ordinances that equal or exceed the minimum requirements of the Uniform Construction Code, such ordinances are subject to review by the Department and may be challenged by any aggrieved party. Section 503 of the Act, 35 P.S. § 7210.503.

The Township Board of Supervisors enacted Ordinance 2005–01 on March 2, 2005. The Ordinance mandates the installation of automatic sprinkler systems in a broad range of construction projects, including newly constructed residential homes and major renovations to existing dwellings. The relevant provisions of the Ordinance provide as follows:

**Section 1.—Fire Suppression Systems**—As set out herein, a fully operational automatic fire suppression system (Fire Suppression System) that meets the requirements of the Pennsylvania Uniform Construction Code as adopted by [the Township] on July 7, 2004 is hereby required:

A. All new construction of a structure or dwelling as defined in Section 200 of the Schuylkill Township Zoning Ordinance of 1955 as amended shall be equipped with a fully operational automatic Fire Suppression System throughout.[4][5]

---

1. Act of November 10, 1999, P.L. 491, *as amended*, 35 P.S. §§ 7210.101–7210.1103.

2. The stated intent and purpose of the Act is to, *inter alia:* (1) encourage standardization and economy in construction; (2) encourage the use of state-of-the-art technical methods, devices and improvements consistent with reasonable requirements for health, safety and welfare; (3) *eliminate existing codes to the extent that such codes were restrictive, obsolete, conflicting and contained duplicative construction regulations*; and (4) eliminate unnecessary duplication of effort and fees relating to the review of construction plans and the inspection of construction projects. Section 102(b) of the Act, 35 P.S. § 7210.102(b).

3. In establishing the Uniform Construction Code, the Department adopted and incorporated by reference various model codes. *See* 34 Pa.Code § 403.21.

4. The Township's zoning ordinance is not in the record. According to the Secretary's opinion, a "structure" is "[a]ny form or arrangement of building materials on or in the water or land for providing proper support, bracing, anchoring or other protection against the forces of the elements, but not

\* \* \*

B. All new addition(s) or structural alteration(s) as defined in Section 200 of the Schuylkill Township Zoning Ordinance of 1955 as amended representing 1,000 square feet or more of gross floor area as defined in the International Building Code (IBC) shall be equipped with a fully operational Fire Suppression System throughout the existing structure and any new addition(s). Additions or alterations to an existing sprinklered structure shall be sprinklered no matter the square footage of the addition or alteration.

C. Fire Suppression System[s] shall be required throughout basements of newly constructed buildings.

R.R. 5a. There is no dispute that the above-cited fire suppression standards exceed those mandated by the Uniform Construction Code.[6]

A timely challenge to the Ordinance was filed by the Pennsylvania Builders Association, the Home Builders Association of Chester and Delaware Counties, The Basile Corporation and SHC, Inc. (collectively, Objectors).[7] Objectors argued that the Ordinance did not satisfy the legal standard enumerated in the Act for exceeding the minimum requirements of the Uniform Construction Code. The Department notified the Township that a challenge had been filed, and the parties proceeded to a hearing before a Hearing Officer appointed by the Secretary.

■ At the hearing, the Township defended the Ordinance as a response to certain local circumstances and conditions that it believes to hamper firefighting in the Township. Because these conditions all relate to the Township's changing demographics, the Township offered evidence of the suburbanization and population growth it has been experiencing since the 1980's. The Township introduced into evidence the Delaware Valley Regional Planning Commission's "Phoenixville Area Intermodal Transportation Study (Trans-

including fences. Anything constructed or erected on the ground or attached to the ground including but not limited to buildings, sheds, manufactured or mobile homes or other similar items." Secretary's Adjudication and Order, Finding of Fact No. 3 (citing Notes of Testimony (N.T.), July 13, 2005, at 287–288; Reproduced Record at 298a–299a (R.R.——)).

5. Section 1.A of Ordinance 2005–01 exempts a residential structure which is not served by public utilities, contains less than 500 square feet of floor space and is less than 15 feet high. R.R. 5a.

6. As noted previously, the Uniform Construction Code incorporates by reference a number of model codes. One of these codes, the International Residential Code (IRC), regulates the construction of residential buildings. The IRC does not require automatic sprinkler systems in one and two-family dwellings or in townhouses which are three stories or less in height. The Uniform Construction Code also incorporates portions of the International Building Code (IBC), which regulates the construction of all other buildings except one and two-family dwellings covered by the IRC. Automatic sprinkler systems are required by the IBC in only a limited number of building types, such as those used for hazardous or institutional purposes.

7. Section 503(j)(1) of the Act permits "[a]ggrieved parties ... 30 days from the date of enactment of the ordinance to file a written challenge with the [D]epartment ...". 35 P.S. § 7210.503(j)(1). The Department is authorized to review "any ordinance which would equal or exceed the minimum requirements of the Uniform Construction Code." Section 503(j)(2) of the Act, 35 P.S. § 7210.503(j)(2). If the Department disapproves the ordinance, it is null and void. Section 503(k) of the Act, 35 P.S. § 7210.503(k).

portation Study)"[8] showing that the population of the Township in 1980 was 5,993. Transportation Study, at 17, Table 1;[9] N.T., July 13, 2005, at 158; R.R. 169a. This number decreased to 5,538 in 1990. According to Jerry Coyne, Manager of the Commission's Office of Transportation Studies, the Township's population increased to 6,155 in 1997. In 2000, the population reached 6,960, an increase of approximately 16 percent from 1980 according to Coyne. The Commission estimated that the Township's population will reach 11,503 in 2025, which Coyne testified would constitute an increase of 87 percent over the Township population in 1997.

The first local circumstance or condition cited by the Township concerned the effect of the above demographic changes on its all-volunteer fire department. William Beittel, Jr., Chief of the Township's Fire Department, stated that greater numbers of white collar workers are living within the Township and commuting to work outside the Township. As a result, only three out of the Township's 40 volunteer firefighters actually live *and* work within the Township. Beittel also testified that it has become increasingly difficult to recruit and retain a volunteer firefighter force. Edward Mann, Pennsylvania State Fire Commissioner, testified that volunteer recruiting and retention is a nationwide problem that is compounded in Pennsylvania because 96 percent of its communities are protected by volunteer fire departments. Mann estimated that Pennsylvania is losing 8,000 volunteer firefighters every year.

A second local condition cited by the Township was traffic congestion, which, when combined with the steep topography of Valley Forge Mountain on the eastern edge of the Township, inhibits rapid travel by firefighting personnel and extends response times to fire scenes. The Township offered evidence that its main arterial roadways are already congested with traffic generated by Township residents and by non-residents traveling through the Township on their way to work and regional shopping, entertainment and dining attractions. Coyne testified that the average daily travel speed in 1997 on the Township's local, collector and arterial roadways was 26 miles per hour. Assuming that current transportation improvement programs are implemented, the Commission expects the average daily travel speed to decrease to 11 miles per hour in 2025.[10] The Township's Chief of Police observed that traffic has been getting more congested over the years and, in his opinion, inhibits volunteer firefighters from performing their duties since they must travel on the same congested roadways.

The third and final condition cited by the Township related to trends in residen-

---

8. The Transportation Study, completed in 2003, evaluated regional development and traffic congestion in the Township and four surrounding municipalities: the Borough of Phoenixville; Charlestown and East Pikeland Townships in Chester County; and Upper Providence Township in Montgomery County. One of the goals of the study was to make recommendations for accommodating regional development and travel in the greater Phoenixville area to the year 2025.

9. All of the even-numbered pages are omitted from the copy of the Transportation Study contained in the certified record. Although our review is not compromised by these omissions, we remind the Township that it is the appellant's responsibility to supply the Court with a complete record for purposes of review. *Smith v. Smith*, 431 Pa.Super. 588, 637 A.2d 622, 623 (1993).

10. Excluded from the Commission's average daily speed calculations are the expressways located within the Township and the Pennsylvania Turnpike.

tial home construction. John Yerkes, the Township's Building Official, and John Waters, Chief Fire Marshal for Upper Merion Township, testified that most homes today are constructed with lightweight wood trusses instead of sawn wood joists and beams. While state of the art, these engineered building products have a higher surface to mass ratio, allowing them to burn more rapidly. At the same time, homeowners are filling their homes with more and more combustible items, which also allow fires to progress more rapidly. The result of these trends is a greater propensity for structural collapse. Yerkes testified that several housing developments are under construction in the Township or were recently completed. Typically, these developments contain more houses with smaller lots.

The Township also developed an extensive record on fire suppression and the efficacy of sprinkler systems. Fire Marshal Waters explained that "flashover" occurs when a fire creates sufficient heat in a compartment to ignite all of the combustible materials. According to Waters, the flashover point is reached more quickly than 20 years ago because of the increase in combustible materials placed in homes. Flashover now occurs, on average, within 3 to 4 minutes of ignition. Waters acknowledged that even under ideal circumstances it is impossible for a volunteer fire company to respond to a fire and set up the necessary equipment before flashover occurs. Proponents of sprinkler systems point out that applying water directly to the burning materials in a compartment is simply the most effective way to extinguish a fire in its incipient stage and prevent flashover from occurring. In short, the Township's evidence showed that sprinklers are the most effective way to minimize the impact of the cited local conditions on fire suppression.

The Secretary considered the evidence adduced at the hearing and made 33 findings of fact. The Secretary concluded that the Township "failed to establish *clear and convincing* local climatic, geologic, topographic or public health and safety circumstances and conditions in the Township to justify the enactment of Ordinance 2005–01." Secretary's Adjudication and Order, at 9 (emphasis original). The Secretary invalidated the Ordinance. The Township appealed to the trial court,[11] and it affirmed. The present appeal followed.

The Township's issues on appeal may be summarized as follows.[12] First, the Township argues that the Secretary erred by considering whether the Township's proffered local circumstances and conditions are "atypical" in Pennsylvania. Second, the Township contends that the Secretary's decision was not supported by substantial evidence because it fails to adequately consider all of the circumstances and conditions described at the hearing and the cumulative effect of those conditions.

At the heart of this appeal is the Secretary's interpretation and application of Section 503(j)(2) of the Act, 35 P.S. § 7210.503(j)(2). Section 503(j)(2) sets

11. An appeal of the Secretary's ruling may be taken to the appropriate court of common pleas within 30 days of the date of the ruling. Section 504(a) of the Act, 35 P.S. § 7210.504(a).

12. Where, as here, a complete record is developed before the local agency, our scope of review is limited to determining whether constitutional rights were violated, whether there was an error of law or violation of agency procedure and whether necessary findings of fact are supported by substantial evidence. *Gilotty v. Township of Moon*, 846 A.2d 195, 198 n. 3 (Pa.Cmwlth.2004); *see also* 2 Pa.C.S. § 754(b).

forth standards by which the Secretary reviews a challenge to a local ordinance which exceeds the minimum requirements of the Uniform Construction Code. It states:

> The department shall review any ordinance which would equal or exceed the minimum requirements of the Uniform Construction Code based on the following standards:
>
> (i) that certain *clear and convincing local climatic, geologic, topographic or public health and safety circumstances or conditions* justify the exception;
>
> (ii) the exception shall be adequate for the purpose intended and shall meet a standard of performance equal to or greater than that prescribed by the Uniform Construction Code;
>
> (iii) the exception would not diminish or threaten the health, safety and welfare of the public; *and*
>
> (iv) the exception would not be inconsistent with the legislative findings and purpose described in section 102.

35 P.S. § 7210.503(j)(2) (emphasis added). The Secretary concluded, and the trial court agreed, that the Township failed to satisfy subsection (i) by offering clear and convincing local climatic, geologic, topographic or public health and safety circumstances or conditions to justify deviating from the Uniform Construction Code, which does not require sprinklers in one and two-family dwellings.

■ The Township's first issue is one of statutory interpretation. The Township argues that the Secretary misinterpreted subsection (i), as evidenced in the following language from the Secretary's adjudication:

> Although the Township has demonstrated that [it], like many municipalities in the Commonwealth, is dependent upon a volunteer fire department, is experiencing growth and development, resulting in increased traffic congestion during peak working hours, and has within it a mountainous area with steep slopes that slows the speed of trucks, *these conditions are not atypical.* More important to this challenge, these conditions, standing alone, do not justify an exception to the general rule of uniformity.

Secretary's Adjudication, at 18–19 (emphasis added). Emphasizing the words "not atypical," the Township contends that the Secretary engrafted an additional requirement onto Section 503(j)(2)(i) that a municipality must prove the local conditions are unique to the municipality. The Township asserts that this interpretation is contrary to the plain language of the Act, which requires only that the proffered conditions are present in and impact the municipality in order to justify an exception.

The Township overstates the import of the Secretary's use of the phrase "not atypical." We agree with the trial court that the Secretary's statement was factual, not legal, in import. The Secretary's ultimate conclusion was not dependent upon whether the Township's proffered conditions were "uniquely" local. Rather, the Secretary's observation that the Township's conditions were not atypical was cited as a reason to explain his ultimate conclusion that conditions in the Township did not justify an exception to the Uniform Construction Code.

Even if the Secretary did equate "local" with "atypical," this was not error. This interpretation is, in fact, consonant with the basic tenet of statutory construction that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage[.]" 1 Pa.C.S. § 1903(a). The term "local" is not defined in the Act, therefore

we may look to the dictionary definition for guidance:

1: characterized by or relating to position in space: having a definite spatial form or location ...

2: characterized by, relating to, or occupying a particular place: characteristic of or confined to a particular place: *not general or widespread* ...

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1327 (2002). The Township relies upon the first definition, which in the case at bar would mean that a condition is "local" solely by virtue of the geographic location in which it exists. Objectors rely on the second definition, which would mean that a "local" condition is one that is also "not general or widespread" in the Commonwealth.

The Secretary's reasoning draws upon both definitions. Types of "clear and convincing" conditions to justify an exception could be *local and atypical*, in that they are "not general or widespread" in the Commonwealth. They could be *local and typical* of conditions found in many places in the Commonwealth but, for some special, "clear and convincing" reason, these conditions justify a deviation from the uniform standards designed for statewide use. Thus, we reject the Township's suggestion that atypicality, which means only "not general or widespread," should play no role in the Secretary's inquiry.

Two examples of Pennsylvania municipalities that have successfully implemented sprinkler ordinances illustrate how the requisite local conditions may justify an exception. The first municipality, Marcus Hook, was described by Douglas Meshaw, Director of Association and Member Services and a building codes resource person for the Pennsylvania Builders Association, one of the Objectors in this case. Marcus

Hook is a municipality of 1.1 square miles adjacent to the Delaware River in Chester County. Located at opposite ends of Marcus Hook are two major oil refineries. As a result, the municipality is traversed by pipelines carrying oil, fuel and steam. According to Meshaw, the world's largest propane storage tank lies underneath the municipal town hall. For these reasons, Marcus Hook enacted an ordinance requiring automatic sprinklers in all two-family homes and larger dwellings.[13] Meshaw testified that the Association did not challenge Marcus Hook's ordinance because it believed the municipality had demonstrated clear and convincing local public health and safety circumstances or conditions as required by Section 503(j)(2)(i) of the Act, 35 P.S. § 7210.503(j)(2)(i). .

A second municipality to enact a sprinkler ordinance was Carroll Valley Borough in rural Adams County. Although the Association and other objectors opposed this ordinance, it was upheld by both the Secretary and the common pleas court. The circumstances and conditions present in Carroll Valley Borough were aptly summarized by the Secretary in his opinion:

[T]he Borough is, essentially, a subdivision carved into the side of a mountain encompassing an area of five and a half square miles, with over 70 miles of roads. Over 53% of the topography within the Borough is on at least a 12–degree slope, with many sections of the Borough sloping as much as 70 or 80 degrees.

The Borough has real public health and safety concerns with its ability to protect the lives of its residents in the event of a fire. The majority of the Borough—ninety percent (90%)—is residential. Over two-thirds of the homes situated in the Borough are located in the mountainous

---

**13.** Single-family homes were exempted.

N.T., October 20, 2005, at 340; R.R. 352a.

areas, with less than one-third of the current residential development located on the valley floor. Add to a topography of hills, mountains and valleys many roads which are impassable, no public water supply, no fire hydrants, no municipal fire company and no volunteer fire company, and the risk of fire-related harm or death to residents in the Borough in the event of a residential fire is substantial.

R.R. 476a–477a. The Secretary concluded, and the common pleas court agreed, that the foregoing factors constituted clear and convincing local topographic and public health and safety circumstances and conditions under Section 503(j)(2)(i).

Marcus Hook and Carroll Valley are instructive for two reasons. First, they exemplify the types of "clear and convincing local" circumstances and conditions that will justify a sprinkler ordinance. Second, and more importantly, they illustrate how the requisite conditions can be "local" in *both* senses of the dictionary definition of that term. In the case of Marcus Hook, the circumstances and conditions created by two large oil refineries are certainly atypical and perhaps unique in Pennsylvania. By contrast, the topographical and hydrological conditions present in Carroll Valley Borough are certainly not confined to that municipality; steeply sloped land and lack of public water describe many of the rural areas in northern and central Pennsylvania.[14] What is significant about Marcus Hook and Carroll Valley is that in both cases, the "local" circumstances and conditions justified an exception to the standards in the Uniform Construction Code *intended for use throughout Pennsylvania.*

In sum, we hold that the Secretary did not err in his interpretation of Section 503(j)(2)(i) of the Act, 35 P.S. § 7210.503(j)(2)(i). The Secretary did not engraft a uniqueness requirement into the statute. He simply required the Township to show that conditions there were so different from the statewide norm that the uniform standards were not appropriate to use in the Township. This was an appropriate inquiry in determining whether local circumstances and conditions justify an exception.

■ The Township argues, next, that the Secretary's decision to strike the Ordinance was not supported by substantial evidence. The Township cites the evidence it presented regarding its burgeoning population and the concomitant unavailability of volunteer firefighters; traffic congestion exacerbated by topographic conditions; and a proliferation of residential building techniques that accelerate the spread of fires. The Township asserts that the Secretary failed to adequately consider this "uncontradicted" evidence and the cumulative impact of the foregoing factors. We disagree.

At the outset, we reject the Township's assertion that its evidence was uncontradicted. Point for point, Objectors cross-examined the Township's witnesses and exposed weaknesses in the Township's case. Objectors also presented their evidence in rebuttal to the Township's case for an exception. Further, the Secretary did consider the Township's evidence on each condition that the Township believed to justify a deviation from the Uniform Commercial Code. However, the Secretary's consideration of the Township's evidence led him to the conclusion that the Ordinance could not be sustained.

---

14. Municipalities that meet this description may also be justified in requiring sprinklers in    new residential construction.

With respect to the Township's case on the declining number of voluntary firefighters, the Secretary noted several problems. First, the Township produced no evidence to quantify how far firefighters must typically travel from work to the fire station in order to respond to a fire. Additionally, the Township produced no evidence to show that the response time of the fire department or the number of firefighters responding to any call was ever inadequate. The Secretary emphasized that the fire department currently has 40 active members, and no evidence was presented that this number is inadequate to fight fires in the Township. Indeed, Fire Chief Beittel testified that out of 292 fire calls in 2004, less than 10 involved single-family homes. Beittel testified further that part of the fire department's overall fire prevention strategy involves advising developers on placement of fire hydrants in new housing developments.[15] The department's members are required to tour new developments during the construction phase to familiarize themselves with layouts and construction techniques.

With respect to second local condition cited by the Township, *i.e.,* road congestion and topography, the Secretary again noted several flaws in the Township case. Essentially, the Township contended that increasing levels of traffic, combined with the steep topography of Valley Forge Mountain on the eastern edge of the Township, inhibit rapid vehicular travel and lengthen the response times to fire scenes. However, the Secretary observed that although the eastern areas of the Township contain sleep slopes, the Township's own expert testified that very few roadways traverse this area and that he was unaware of any roadway exceeding a slope of 25 percent. The Zoning Official acknowledged the Township's development is not occurring in the mountainous areas but in the flatter pasture areas. The Secretary emphasized that no evidence was presented to show that firefighters have been unable to respond to structural fires in any area of the Township due to steepness in grade, or for any other reason. The Secretary questioned the average daily speed calculation of 11 miles per hour in 2025 because it did not account for the fact that emergency vehicles equipped with warning lights and sirens typically travel faster than the traffic stream, as was conceded by the Township's witnesses.

The final local condition cited by the Township was the use of wood trusses to construct homes instead of sawn beams and joists, which are dense and less combustible than trusses. Fire Marshal Waters opined that wood trusses ignite and burn more rapidly, which hastens the collapse of the entire structure, resulting in greater risks of injury and death for occupants and firefighters. However, the Secretary concluded that the use of trusses was not really local at all. Instead, the Secretary noted that the trend toward using engineered building products is now predominant throughout the United States and Pennsylvania and is expressly permitted under the Uniform Construction Code. As support for this finding, the Secretary noted testimony by the Township's Zoning Official and the Chairman of the International Residential Code Building and Energy Code Development Committee. Based on the foregoing, the Secretary concluded

---

15. The Township's subdivision and land development ordinance requires consultation between developers and the Township's fire marshal on the location of fire hydrants. The ordinance also requires that all "new development shall begin with a hydrant located at the entrance to the subdivision and shall locate one hydrant within 600 feet of each existing and proposed structure." N.T., October 20, 2005, at 249; R.R. 260a.

that truss construction was not a clear and convincing local condition.

The Township also argues that because the Secretary discussed each of the above circumstances and conditions separately, he erred by failing to consider their cumulative effect. We disagree for two reasons. First, the Township failed to offer substantial evidence regarding the one factor that was supposed to conjoin the others: rapid population growth. While the Township's population has increased since 1980, and presumably will continue to increase, there is no baseline against which to measure that growth. The Township produced no evidence to support its claim that Pennsylvania's statewide ten-year growth rate in 2000 was 3.4 percent, as opposed to the Township's growth of 25.7 percent.[16] Second, it is difficult to see how the other circumstances and conditions, none of which were individually clear and convincing, can become cumulatively clear and convincing when considered together. The proverbial chain is only as strong as its weakest link.

In short, there is no doubt that sprinkler systems are an effective tool in fire suppression and that they save lives. As the Secretary properly noted, however, the efficacy of sprinkler systems is not the issue in this case. Rather, it was whether the Township proffered clear and convincing local conditions to justify a deviation from the minimum requirements of the Uniform Construction Code, which does not require automatic sprinklers in residential buildings. The Township failed to do so and, accordingly, we affirm the trial court's order.[17]

Judge SIMPSON did not participate in the decision in this case.

## ORDER

AND NOW, this 6th day of September, 2007, the order of the Court of Common Pleas of Chester County in the above-captioned matter, dated August 29, 2006, is hereby AFFIRMED.

---

**16.** The Township's brief provides a hyperlink to the U.S. Census Bureau's website as its source for Pennsylvania's ten-year growth rate of 3.4 percent. Brief of Appellant at 34. Activating the hyperlink does not reveal any such percentage. The Township's claim that its population grew 25.7% in the same period is also unsupported. We also note that the Township offered no expert testimony on these crucial growth rate statistics.

**17.** The Township raises three additional arguments on appeal. First, the Township asserts that this Court must remand this matter if we uphold the Secretary's "new" requirement that a local circumstance or condition under Section 503(j)(2)(i) of the Act must also be unique. We need not consider this argument further since, for the reasons stated above, we reject the Township's premise that the Secretary engrafted a "uniqueness" requirement onto Section 503(j)(2)(i) of the Act. Second, the Township argues that the Ordinance is consistent with Section 503(j)(2)(iv) of the Act, which requires that an exception from the Uniform Construction Code be consistent with the legislative findings and purpose of the Act. It is not necessary to consider subsection (iv), however, since the Township failed to satisfy the standard enumerated in subsection (i). Third, the Township asserts that the Secretary's decision is unconstitutional because it forecloses the Township from fulfilling its obligation to protect the safety, health and welfare of its citizens. This argument is without merit since the Township is not foreclosed from enacting a sprinkler ordinance. The Township is free to enact such an ordinance as long as it complies with Section 503(j)(2) of the Act, 35 P.S. § 7210.503(j)(2).